UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MOHAMMAD YOUSEFPOUR, MARIAM
ABBOTT, and ESMAT BAHMANPOUR                                    PLAINTIFFS

v.                                    Case No. 04-CV-0898

ANNETTE M. FANCHER, Individually and
d/b/a NEW YORK BANDIT TRUCKING and
LEONARD G. SNIDE                                                DEFENDANTS

<u>ORDER</u>

Presently before the Court are Plaintiffs' Motion for Partial Summary Judgment as to

Liability and Serious Injury and Defendants' Cross-Motion for Summary Judgment with Respect

to Plaintiff Esmat Bahmanpour on the issue of serious injury.

## I.  BACKGROUND

On July 1, 2004, at approximately 6:50 p.m. on Route 42, Cumberland Head Road,

approximately one-tenth of a mile (or 500 feet) west of the intersection of that road with

Sunnyside Road in Clinton County, New York, a collision occurred between at least the trailer of

a 2003 Kenworth tractor-trailer[1] and a 2001 Honda Civic.  Defendant Leonard Snide was the

operator of the tractor-trailer as an employee of Annette Fancher, who did business under the

name of New York Bandit Trucking and was the owner of the tractor trailer.  Plaintiff

Mohammed Yousefpour was the owner and operator of the Honda Civic.  His sister, Mariam

Abbott, was a passenger in the back seat of the Honda Civic.  Esmat Bahmanpour, the mother of

Mr. Yousefpour and Ms. Abbott, was a passenger in the front seat of the Honda Civic.

---

[1]Plaintiffs state that the collision occurred between the tractor-trailer and the Honda,
while Defendants assert more specifically that the impact was between the trailer and the Honda.

Immediately before the collision occurred, Mr. Snide was operating the tractor-trailer westbound on Route 42.  Mr. Yousefpour was operating the Honda Civic eastbound on Route 42 within the posted suggested speed limit of 15 miles per hour.  Mr. Stephen Burdick was operating a 2004 Volkswagen Jetta eastbound on Route 42, with Carolyn Burdick as a passenger in the front seat, immediately behind the Honda Civic being operated by Mr. Yousefpour.

Stephen Burdick states that he saw the front wheel on the driver's side of the tractor-trailer pass over the double-yellow center lie of the roadway and enter the eastbound travel lane. Stephen and Carolyn Burdick state that they witnessed the trailer portion of the tractor-trailer jackknife, which caused the trailer portion to completely cross the center double-yellow line and enter the eastbound lane of travel, where the trailer collided with the front of the Honda Civic.

In his affidavit, Mr. Snide asserts that as he approached the curve, he was traveling approximately 25 miles per hour, but applied the brakes to his vehicle, causing the vehicle to slow down.  He states that he reapplied his brakes prior to the curve.  Mr. Snide asserts that the right side of the trailer was on or near the right fog line of the highway, and therefore, the left side of the trailer could not be to the left of the center yellow lines.  Mr. Snide states that his trailer stayed to the right of the center double yellow line and that the damage to his vehicle and the Yousefpour vehicle was inconsistent with an impact involving a tractor-trailer jackknife.  He further states that no collision occurred between the trailer and the front portion of the Plaintiff's vehicle.

It is undisputed that the collision occurred at a curve on Cumberland Head Road.  When the collision occurred, Mr. Snide felt a thump.  As a result of the collision, Mohammad Yousefpour sustained multiple cervical spine fractures of his neck, a fractured collar bone and rib

fractures.  As a result of the collision, Mariam Abbott sustained an open fracture of her elbow, skull fracture and fracture of her upper jaw.  Plaintiffs assert that as a result of the collision, and seeing her children injured, Esmat Bahmanpour suffered post-traumatic stress disorder and depression.  However, Defendant asserts that Ms. Bahmanpour suffered post-traumatic stress disorder with periodic relapses of depression and psychotic depression as a result of being shot and stabbed by her ex-husband in 1982, not as a result of the collision.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is awarded when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "In ruling on a motion for summary judgment, the district court is required to 'resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'"  *Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 216 (2d Cir. 2001)).  "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under governing law."  *Jeffreys v. City of N.Y.,* 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).  "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Id.* (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

"Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."  *Id.* at 553-54.  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff."  *Id.* at 554

(quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202

(1986) (emphasis added)).  "To defeat summary judgment, therefore, nonmoving parties must do

more than simply show that there is some metaphysical doubt as to the material facts, and they

may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (internal citations

omitted).  "At the summary judgment stage, a nonmoving party must offer some hard evidence

showing that its version of the events is not wholly fanciful." *Id*.  "Although all inferences must

be drawn in favor of the nonmoving party, mere speculation and conjecture is insufficient to

preclude the granting of the motion."  *Guilbert v. Gardner,* 480 F.3d 140, 145 (2d Cir. 2007)**.**

## III.    LIABILITY ISSUE

Plaintiffs move for summary judgment as to liability.  New York State Vehicle and

Traffic Law § 1120(a) states that "upon all roadways of sufficient width, a vehicle shall be driven

upon the right half of the roadway."  "[A] driver in his or her proper lane of travel is not required

to anticipate that a vehicle proceeding in the opposite direction will cross over into oncoming

traffic."  *Wasson v. Szafarski*, 6 A.D.3d 1182, 1183 (N.Y. App. Div. 2004).

Plaintiffs argue that summary judgment is proper because New York courts have held

that, when a plaintiff establishes that a defendant's vehicle crossed over onto the wrong side of

the road, into oncoming traffic, and collided with the vehicle plaintiff was in, the plaintiff has

established a prima facie case that the negligence of the defendant caused the accident.  *Arrowitz*

*v. Arrowitz*, 279 A.D.2d 440 (N.Y. App. Div. 2001).  Plaintiffs cite *Cummins v. Rose*, 185

A.D.2d 839 (N.Y. App. Div. 1992), in support of their argument that summary judgment is

appropriate.  There, the court granted plaintiff's motion for partial summary judgment on the

issue of liability holding that the defendant was "unquestionably responsible for causing the

accident while Cummins was free from culpable conduct." *Id*. However, in *Cummins*, three eyewitnesses testified at examinations before trial that the defendants' vehicle crossed the yellow line in a no-passing zone, and neither the plaintiff nor the defendant had any recollection of the accident. *Id*.

Plaintiffs state that they have submitted the deposition transcripts and sworn statements of two eyewitnesses to the accident, Stephen and Carolyn Burdick. Plaintiffs argue that the Burdicks averred that Defendant Snide's tractor-trailer crossed over the double-yellow center line into oncoming traffic, causing a direct collision with Plaintiffs' vehicle. They further averred that Mr. Yousefpour did nothing to contribute in any way to the cause of the accident, and that there was nothing that he could have done to avoid the collision. Plaintiffs also argue that the NYS Police report establishes that the sole cause of the accident was Defendant Snide's failure to keep right.

However, in his affidavit, Defendant Snide denies that he crossed the double-yellow line. Mr. Snide states that although he was not able to see the left rear side of the trailer using the mirrors on the vehicle, he knew the position of the trailer based upon his experience. He further states that although he could not see the back left side of the trailer and did not see the impact between the Plaintiffs' vehicle and the left rear side of the trailer, he noted that the trailer had not crossed into the oncoming lane of traffic the first time he checked the mirror after feeling the thump. He asserts that immediately after hearing the thump, he looked at the right side mirror to see whether his trailer had struck a mailbox while it was tracking to the right as it was going around the curve and could tell that the right side of the trailer was on or near the right fog line of the highway. Here, even if the evidence upon which Defendant Snide relies is circumstantial,

there is an issue of material fact as to whether Defendant Snide crossed the double-yellow line.
Therefore, the facts in *Cummins* are clearly distinguishable, and summary judgment is not
appropriate.

**IV.    SERIOUS INJURY AS TO PLAINTIFFS**

Under New York law, Plaintiffs may only recover for personal injuries suffered as a result
of a motor vehicle accident if such injuries rise to the level of "serious injury," as defined by
statute as follows:

> "Serious injury" means a personal injury which results in death; dismemberment;
> significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a
> body organ, member, function or system; permanent consequential limitation of
> use of a body organ or member; significant limitation of use of a body function or
> system; or a medically determined injury or impairment of a non-permanent
> nature which prevents the injured person from performing substantially all of the
> material acts which constitute such person's usual and customary daily activities
> for not less than ninety days during the one hundred eighty days immediately
> following the occurrence of the injury or impairment.

N.Y. Ins. Law § 5102(d).

Plaintiffs move for summary judgment on the serious injury issue as to Plaintiffs
Mohammad Yousefpour and Mariam Abbott.  Plaintiffs submit evidence that Mohammad
Yousefpour was diagnosed with closed cervical fractures at C1-C7, closed fracture of the clavicle
and fracture of the rib, sustained as a result of the collision.  Additionally, Mariam Abbott
suffered an open skull fracture, elbow fracture, and upper jaw fracture as a result of the collision,
requiring her jaw to be surgically wired shut.  Defendants fail to address these contentions in
their response.  It is clear that these Plaintiffs suffered serious injury under New York law.

Therefore, summary judgment is granted as Plaintiffs Yousefpour and Abbott regarding the serious injury issue.

Plaintiffs also move for summary judgment on the serious injury issue as to Plaintiff Esmat Bahmanpour.  Defendants respond by filing a Cross-Motion for Summary Judgment on the serious injury issue as to Plaintiff Esmat Bahmanpour.  Plaintiffs allege that due to witnessing her children sustain serious and life threatening injuries in the collision, Esmat Bahmanpour suffers from post-traumatic stress disorder and depression.[2]  Defendants argue that Ms. Bahmanpour's condition does not rise to the level of serious injury.

"[P]sychological injury can qualify as 'serious injury' within the meaning of Insurance Law § 5102(d)."  *CityWide Social Work & Psy. Serv., P.L.L.C. v. Travelers Indem. Co.*, 3 Misc.3d 608, 611, 777 N.Y.S.2d 241, 244 (N.Y. Civ. Ct. 2004).  "But courts will look for 'objective medical evidence' of the injury."  *Id.*  "[T]wo district courts in the Second Circuit have held that Post-Traumatic Stress Disorder ("PTSD") or clinical depression falls within the definition of serious injury under NYIL § 5102(d).  *Wahl v. Lohiam*, 235 F. Supp. 2d 334, 336 (S.D.N.Y. 2002) (citing *Kane v. United States of America*, 189 F. Supp. 2d 40, 52 n.5 (S.D.N.Y. 2002) (referring to clinical depression as serious injury under the NYIL); *Thomas v. National Car Rental Systems, Inc.*, 1988 WL 28097, at *2 (E.D.N.Y. 1988) (holding that PTSD is a serious injury under the NYIL)).

In *Cushing v. Seemann*, 247 A.D.2d 891, 892, 668 N.Y.S.2d 791, 792-93 (N.Y. App. Div. 1998), the court found that there were triable issues of fact concerning whether the plaintiff's

---

[2]It appears that the parties concede that if Esmat Bahmanpour sustained any physical injuries, such injuries would not qualify as serious injuries.

emotional injuries constituted a serious injury and whether she had a viable "zone of danger" claim for emotional injuries.  The plaintiff submitted medical records and the affidavits of the plaintiff's treating psychiatrist and psychologist documenting the plaintiff's impairment as a result of severe psychological trauma upon experiencing the accident and witnessing the injury and death of her son.  *Id.*  The plaintiff also submitted employment records showing that, upon resuming work, the plaintiff was unable to function in her job.  *Id.  But see Sellitto v. Casey*, 268 A.D.2d 753, 755, 702 N.Y.S.2d 177, 180 (N.Y. App. Div. 2000) (holding that an affidavit of plaintiff's treating psychologist stating that he began treating plaintiff for posttraumatic stress disorder which he averred was caused by the accident, that plaintiff experienced disturbed sleep cycle and flashbacks which significantly affected her daily activities for a period of seven months after the accident was insufficient to establish that plaintiff suffered a significant limitation of use of a body function or system because it failed to provide that objectively measured quantum of evidence necessary to satisfy this category of serious injury).

Plaintiffs argue that they have met their burden of demonstrating that Esmat Bahmanpour sustained a serious injury for summary judgment purposes.  It appears that Plaintiffs only pursue their theory of "serious injury" on th basis of the following two standards: (1) "significant limitation of use of a body function or system;" or (2) "a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment."

In support of their motion, Plaintiffs submit the affidavit and deposition testimony of Suzanne M. Kennedy, M.D., Esmat Bahmanpour's treating psychiatrist, the deposition testimony of Jennifer Ayer, M.D., Esmat Bahmanpour's primary care physician, the affidavit of Mariam Abbott, the affidavit of Mohammad Yousefpour, and Esmat Bahmanpour's deposition testimony. Dr. Kennedy's affidavit and Dr. Ayer's testimony provide the following history and information: Esmat Bahmanpour was shot by her husband in the early 1980's. She had stable psychosis. In years prior to 2004, she had two psychotic episodes that did not require hospitalization, the last of which occurred in March of 2003 following a discontinuance of her antipsychotic medication by her treating physician at the time. Between her prior psychotic episodes, she was able to function quite well. Dr. Kennedy opines that just before the accident, Ms. Bahmanpour's global assessment of functioning, which is a common diagnostic tool that uses a numeric value from "0" to "100", was around "65", which indicates that she had some mild symptoms or some difficulty in social functioning, but generally was functioning pretty well and had some meaningful interpersonal relationships. On July 1, 2004, Ms. Bahmanpour was involved in a traumatic auto accident in which she witnessed her two children being severely injured. She suffered a progressive and worsening decline in her overall functioning following the July 1, 2004, auto accident.

On October 20, 2004, Ms. Bahmanpour was evaluated by Dr. Mark Hoskin, Medical Director for the Howard Center for Human Services, Crisis Center of Chittenden County, who ordered that Ms. Bahmanpour be involuntarily hospitalized on an emergency evaluation as a result of Ms. Bahmanpour's severe loss of functioning and the severity of her episode of major depression and post traumatic stress disorder. At this point, Dr. Kennedy opines that Ms.

Bahmanpour's global assessment was a "15", which indicates that a person may be in danger of hurting them self or others, or occasionally fails to maintain minimal personal hygiene or has gross impairment in communication.

Beginning on October 21, 2004 through November of 2004, Dr. Kennedy treated Ms. Bahmanpour during her inpatient psychiatric hospitalization at Fletcher Allen Health Care.  Ms. Bahmanpour's symptoms were consistent with a diagnosis of major depressive disorder and post-traumatic stress disorder.  At the time of Esmat's discharge from the psychiatric unit on November 9, 2004, she was still very ill and still exhibiting avoidance, social isolation, marked restricted affect, and was not engaging with others, which are all symptoms consistent with a diagnosis of post-traumatic stress disorder and depression.  Dr. Kennedy opines that Ms. Bahmanpour's global assessment was a "30" to "35", which indicates major impairments in several areas, at the time of her discharge.  Upon her discharge, Dr. Kennedy contacted Ms. Bahmanpour's primary care physician, Dr. Jennifer Ayer, and instructed Dr. Ayer to closely monitor Ms. Bahmanpour and consider prescribing medication.  She also referred Ms. Bahmanpour to Visiting Nurse Services.  In January 2006, Dr. Kennedy "became aware that Esmat had once-again been admitted for inpatient psychiatric care and was diagnosed with major depressive disorder, recurrent episode, severe, with psychotic features and post-traumatic stress disorder, all of which 2006 diagnoses were consistent with [her] diagnoses in 2004."

Dr. Kennedy opines "with a reasonable degree of medical certainty, that the July 1, 2004 auto accident was a very strong contributing factor to Esmat's presenting symptoms of post-traumatic stress disorder and depression."  She also states that "Esmat's progressive debilitating decline and severe mental episode, which began following the July 1, 2004 accident and resulted

10

in her involuntary inpatient hospitalization in October and November 2004, was precipitated by

the July 1, 2004 auto accident."  Dr. Kenney further states:

> Esmat suffers from post-traumatic stress disorder, which was aggravated and
> exacerbated by the July 1, 2004 auto accident, and that such condition has caused
> Esmat to be significantly impaired and prevented her from being able to perform
> and participate in her usual and customary daily activities from the date of the
> accident until her hospitalization in 2004. . . . Esmat's prognosis with regard to
> her post-traumatic stress disorder related to the July 1, 2004 accident is "fair" but
> not "good".  Such prognosis is based upon the poor prognostic risk factors for
> post-traumatic stress disorder which Esmat suffers from, including her prior
> exposure to traumatic events, her comorbid depressive disorder, her detachment
> and avoidance, being of the female gender and the severity of the July 1, 2004
> accident.

Dr. Ayer opines that "this will be a chronic, recurring problem . . . [and] this will likely be

recurrently through her lifetime and trying to minimize the recurrences is the goal."

 Mariam Abbott states in her affidavit that prior to the accident, Ms. Bahmanpour

typically began the day with prayer at 5:30 a.m.  She planned the meals and cooked for her family

and neighbors and socialized with her friends and family in person and on the telephone.  She

worked in her garden or in the yard, took the family dogs for walks to the park for exercise,

practiced reading and writing, and read books and magazines.  Ms. Abbott further states that in

late summer 2004, Ms. Bahmanpour stopped coming out of her room, became sad and quiet, and

stopped cooking, calling her friends, and caring for herself.  She did not like to be touched or

spoken to, and eventually stopped talking and eating altogether and isolated herself.  She states

that even after Ms. Bahmanpour's discharge from the hospital in November 2004, she "was very

sick, was not able to care for herself, and was not doing any of the things she normally did before

the accident."  She states that in January 2006, Ms. Bahmanpour had to be re-admitted to the

hospital for a week-long stay.  She also states that her mother is hypersensitive, has heart

palpitations when she is made nervous by other drivers, hides herself indoors, does not visit or

call her friends, and at times does not like to be touched or spoken to and has difficulty sleeping

at night and getting out of bed in the morning.

Defendants argue that Plaintiff cannot establish serious injury under the "significant

limitation of use of a body function or system" standard because she is claiming an aggravation

of a preexisting post traumatic stress disorder.  Defendants state that Plaintiff must not only

prove a causal connection between the injury and the accident, but she must also prove objective

evidence of the aggravation caused by the accident.  Defendants submit the affidavit of Dr.

Melvin Steinhart, which states that "[w]hile the stress of the motor vehicle accident of July 1,

2004 likely caused Ms. Bahmanpour to suffer a relapse of her periodic psychotic depression, her

medical records and her own report reflect that Ms. Bahmanpour received prompt medical

attention and the relapse quickly resolved."  Dr. Steinhart also states that he "do[es] not believe

that the motor vehicle accident of July 1, 2004 caused Ms. Bahmanpour to suffer a 'permanent

loss or significant limitation of use."

Defendants also argue that Plaintiff cannot rely upon the second standard because for the

period of July 1, 2004, through December 28, 2004,[3] Ms. Bahmanpour engaged in substantially

all of her reported pre-accident daily activities, except socializing, other than for the brief period

of October 15, 2004, through November 20, 2004, and one week immediately following the

accident, which totals only 43 days.  Dr. Steinhart states in his affidavit that he does not believe

---

[3]This comprises the 180-day period following the accident.

that "Ms. Bahmanpour was prevented from performing substantially all of the material acts

constituting her usual and customary daily activities for at least one half of the period of July 1,

2004 and December 28, 2004."

Based upon his review of Ms. Bahmanpour's medical records, Dr. Steinhart's report notes

the following:

> Accordingly to the records of Fletcher Allen Healthcare, on 10/18/01, almost 3
> years prior to the MVA [motor vehicle accident], [Ms. Bahmanpour] was found to
> be depressed and having poor sleep.  It was noted at that time that she was to be
> started on Elavil and that she had been depressed since being shot by her husband
> in 1981.  It was also noted that she had gastroparensis since then.  She reportedly
> had episodes of crying and withdrawal and had a psychotic breakdown several
> years previously.  On 12/30/02, it was noted that she was sleeping about 4 hours a
> night and was quite anxious and depressed, worrying excessively.  On 4/11/03, it
> was recorded that she had been having auditory hallucinations and was not eating
> or talking.  She was described as almost being catatonic and wouldn't leave the
> house or let anyone touch her.  She was also noted to be quite suspicious.  On
> 4/16/03, it was noted that she had a tremor and was refusing medication.  She was
> also found to be increasingly paranoid.  However, at that time she reported feeling
> fine.  Because of the fine tremor, her thyroid was to be checked.  On 7/8/03 it was
> noted that she had had a good response to Risperdal 1 mg qd but was still having
> sleeping problems.
>
> On 7/15/04, 2 weeks after the MVA, it was noted that she had discontinued the
> Risperdal because she ran out and was found to be withdrawn and emotionless.

The report also notes that during her hospitalization in October 2004, "[i]t was found that she

was hyperthyroid, which was felt to be largely contributing to her mental status at the time and as

a result, she was transferred to medicine 2 days later."  Additionally, "[o]n 12/1/04, she was

reportedly very upbeat and positive and was described as looking fabulous.  However, she was

noted to be refusing to deal with the past."

If persuasive evidence exists that Plaintiff's alleged injuries were related to a preexisting

condition, the Plaintiff has the burden to come forward with evidence addressing the Defendant's

claimed lack of causation.  In the absence of such evidence, summary dismissal is appropriate.

*Pommells v. Perez*, 4 N.Y.3d 566, 580, 830 N.E.2d 278, 287, 797 N.Y.S.2d 380, 389 (2005).  *See*

*also Clark v. Perry*, 21 A.D.3d 1373, 1373-74, 801 N.Y.S.2d 645, 645-46 (N.Y. App. Div. 2005)

(upholding trial court's grant of summary judgment when the plaintiff failed to present objective

evidence establishing the aggravation as opposed to the underlying condition to rebut the report

of defendant's physician stating that the accident may have aggravated preexisting pain

symptoms, but did not produce significant new/novel symptoms).  In this case, Dr. Kennedy

opines that Ms. Bahmanpour's post-traumatic stress disorder was aggravated and exacerbated by

the accident, and that such condition has caused Ms. Bahmanpour to be significantly impaired

and prevented her from being able to perform and participate in her usual and customary daily

activities from the date of the accident until her hospitalization in 2004.  However, the report by

Defendants' expert, Dr. Melvin Steinhart, states that the accident caused Ms. Bahmanpour's

relapse, although he opines that the accident did not cause Ms. Bahmanpour to suffer "permanent

loss or significant limitation of use" or prevent her "from performing substantially all of the

material acts constituting her usual and customary daily activities for at least one half of the

period of July 1, 2004 and December 28, 2004."  In light of the conflicting testimony by the

parties' medical witnesses, the Court finds that the question of serious injury as to Ms.

Bahmanpour is one for the jury.  Therefore, Plaintiffs' Motion and Defendants' cross-motion

must be denied.

      Accordingly,

      IT IS THEREFORE ORDERED that Plaintiffs's Motion for Partial Summary Judgment

(Docket No. 53) shall be, and it is hereby, DENIED.

14

IT IS FURTHER ORDERED that Defendants' Motion for Partial Summary Judgment (Docket No. 58) shall be, and it is hereby, DENIED.

Dated this 16th day of November, 2007.

/s/Garnett Thomas Eisele_____
UNITED STATES DISTRICT JUDGE